IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TINA PROVENCE              :            CIVIL ACTION
                           :
     v.                    :
                           :
AVON GROVE CHARTER SCHOOL, :
et al.                     :            NO. 07-659

MEMORANDUM AND ORDER

McLaughlin, J.                              July 28, 2008

          In this employment discrimination action, the plaintiff

has brought suit alleging violation of the Americans with

Disabilities Act ("ADA"), intentional and negligent infliction of

emotional distress, retaliation, and violation of the Family and

Medical Leave Act ("FMLA").  The defendants have moved for

summary judgment as to all claims.  This motion refers to the

plaintiff's Second Amended Complaint, which she filed on December

11, 2007.  For the reasons that follow, the Court will grant the

motion in all respects.


I.   Facts

          On a motion for summary judgment, the Court views the

facts in the light most favorable to the nonmoving party and

draws all inferences in that party's favor.  Summary judgment is

appropriate if there are no genuine issues of material fact and

the moving party is entitled to judgment as a matter of law.  Doe

v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 362 (3d Cir.

2008); Fed. R. Civ. P. 56(c).  Once the moving party has shown
that there is an absence of evidence on an issue for which the
nonmoving party will bear the burden at trial, the nonmoving
party must come forward with evidence showing specific facts that
are at issue for trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
324 (1986).

       Unless otherwise noted, the following facts are
undisputed.  Where the parties have agreed that a fact is
undisputed, the Court has not given a citation to the record.
Where the facts are disputed, the Court has provided the
plaintiff's version.  The Court has omitted certain facts that
are not relevant to the grounds of the present motion.

    1.   <u>Events Prior to Provence's September 2005 Surgery</u>

       In August 2003, the plaintiff, Tina Provence
("Provence"), was hired as a cafeteria worker at defendant Avon
Grove Charter School ("Avon" or "the school").  She was promoted
to assistant cafeteria manager in 2004.  In February 2005,
Provence suffered an injury to her right arm and shoulder when a
poorly maintained refrigerator door at the cafeteria fell onto
her.  She required physical therapy and, ultimately, surgery in
both September 2005 and September 2006.  She began to receive
workers' compensation, which she still receives.  During part of
the period after her injury and before her first surgery,

Provence's physical therapy regime required her to perform stretching and other exercises five times a day for nearly an hour at a time.  She was given a 10-pound lifting restriction and could not do certain repetitive motions.  She was also restricted in her ability to lift her right arm over her shoulder.  The school honored these restrictions, at least at first.

Defendant Tony Sokolowski ("Sokolowski") joined Avon as director of human resources in the spring of 2005.  Prior to his arrival, the plaintiff communicated her needs to her immediate supervisor, Buffy Hoeger ("Hoeger"), and an administrator, Barb Wood ("Wood").  After Sokolowski was hired, the plaintiff continued to communicate with Hoeger and Wood, but also had contact with Sokolowski regarding her injury.  Provence met with Sokolowski a few times in the spring and summer of 2005.  It appears that the exact number, timing, and substance of these meetings or conversations may be in dispute, but the parties agree that Sokolowski and Avon were aware of the plaintiff's injury, her physical restrictions, and her need to perform physical therapy exercises.

According to the plaintiff, Wood accommodated her needs, but Sokolowski did not accommodate her need to perform the exercises, telling her that she could do them only on her own time, for instance on her lunch break.  Additionally, the only space she was able to perform the exercises was in a storage

-3-

closet.  The plaintiff testified that she told Sokolowski in the spring of 2005 that she might need surgery in the fall if her condition did not improve.  She testified that Sokolowski told her that if she were not able to return to work within a certain period of time, she could be let go.  She found this statement very upsetting.  Deposition of Tina Provence ("Pl. Dep.") at 27-34, 40, 82.

Provence felt that her job was threatened, and at a certain point she informed workers' compensation of her concerns.  Someone from workers' compensation contacted Sokolowski.  Afterwards, Sokolowski called Provence into his office and, Provence testified, "raised his voice to me and told me, don't call comp, in this tone of voice, when you have a problem.  That's the way he spoke to me."  Pl. Dep. at 76-77.

According to Provence, in May or June 2005, Sokolowski gave Provence papers about the FMLA.  Sokolowski wanted Provence's doctor to sign them.  Provence testified that she did not understand the papers or her rights under the FMLA or whether she should sign the papers and that Sokolowski did not explain them to her.  According to Provence, Provence's doctor refused to sign the papers, saying that Provence was "a workers' compensation patient, not FMLA."  Provence gave the papers back to Sokolowski.  No one took further action regarding the FMLA at that time.  Pl. Dep. at 41-42, 54.

Sokolowski sent the plaintiff a letter dated August 31, 2005, asking for a physician's report specifying the plaintiff's physical condition and work limitations.  Provence testified that workers' compensation was supposed to provide the school with her medical records.  She does not recall whether she responded to the letter herself.  Pl. Dep. at 47.

The plaintiff has attached to her brief a document entitled "Avon Grove Charter School Family & Medical Leave Act Employee Notification Form."  It is addressed from Sokolowski to Provence and dated September 8, 2005.  It recites that, "[o]n 8/29/05, you notified us/we learned that you wanted to take family/medical leave due to [a] serious health condition that makes you unable to perform the essential functions of your job. It was determined that you need this leave beginning on 9/14/05 and that you expect leave to continue until or about 10/31/05." The document states that Provence is eligible for FMLA leave, that she will be required to furnish periodic medical certification, and that she will need a "fitness for duty" report from her doctor before her return to work.  Pl. Br. Ex. B.  There is no evidence in the record that the plaintiff received this notice.

2.   Provence's Surgery, Leave of Absence, and Departure
from Avon[1]

The plaintiff worked up to the day before her surgery.
After her surgery on September 14, 2005, the plaintiff went out
on leave.  On January 12, 2006, Provence saw one of her doctors,
but she testified that he did not tell her she was going back to
work the next day.  Provence testified that she received a call
from some of her fellow cafeteria workers that day, stating that
they had heard she was returning to work the next day.  Provence
testified that this was the first she had heard that she was
supposed to return to work.  Provence did return to work on
January 13, 2006, a Friday.  Pl. Dep. at 62-63.

Provence testified that on her first day back at work,
Hoeger gave her paperwork stating that her job title had changed
from assistant cafeteria manager to lead cafeteria worker.
According to Provence, the former position involved mostly
paperwork, with occasional physical tasks.  In contrast, the
latter position entailed mostly physical work.  The plaintiff's
pay and benefits remained the same.  Provence testified that on
her first day back at work she saw Sokolowski, who asked how she
was doing, and "[she] let him know the doctor told [her that she]
was permanently disabled."  Pl. Dep. at 63-65.

―――――――――――――

[1]   In referring to the end of Provence's employment at
Avon as a "departure," the Court does not express a view on
whether Avon fired Provence or Provence voluntarily resigned, a
question the parties contest.

The following Monday was Martin Luther King Day.  On
the next day, Tuesday, January 17, 2006, Provence did not go into
work.  She testified that she was in a great deal of pain, so she
called Hoeger and said she was not ready to go back to work and
would call workers' compensation and see a doctor.  She told
Hoeger she would call Hoeger again "as soon as [she] had all the
facts in place."  Hoeger said okay.  Provence did contact
workers' compensation that week and saw a doctor.  The doctor
told her she should not return to work, and workers' compensation
told her that it had contacted Sokoloski with updated
information.  Pl. Dep. at 68-70, 84-87.

Provence did not come into work on January 18, 19, or
20, and she did not call the school on those days.  Pl. Dep. at
69, 95-97.

On January 21, 2006, Provence received a letter dated
January 20, 2006, and signed by Sokolowski stating that she had
voluntarily resigned her position effective January 17.  The
letter stated that the doctor Provence saw on January 12 had
released her to return to work, that the school was able to
provide her with the accommodations she needed, and that there
had been no indication from workers' compensation that she could
not work.  As a result, the letter stated, Avon had concluded
from Provence's absences that she had voluntarily resigned her
position.  The plaintiff requested in writing that she be

-7-

reinstated, and Avon denied the request.  Pl. Dep. at 97-98, 105;
Pl. Br. Ex. D.


    3.  <u>Events Following Provence's Departure</u>

        Provence's three children were students at Avon while
she worked there and through the 2006-2007 school year.  The
plaintiff testified and her husband provided an affidavit stating
that Avon took certain actions against two of the children during
the 2006-2007 school year.

        First, on April 12, 2007, Provence's daughter
Jacqueline received detention, while other students who engaged
in similar behavior did not.  Provence testified, "I have no
problem with my child being reprimanded for something she did,
but I also feel if there are other people, they should all be
reprimanded."  It appears from the record that the sole basis for
the Provences' belief that no other students were disciplined is
Jacqueline's statements to them.  Second, in or about April 2007,
the school subjected Jacqueline to closer scrutiny than her
peers.  Third, in or about June 2007, Avon withheld Provence's
son Michael's report card, stating that his lunch account was not
fully paid.  Provence left Hoeger a message stating that
Jacqueline had a credit on her lunch account and therefore, under
the school policy, Jacqueline's credit should be applied to any
shortfall on Michael's account, or the children's accounts should

be considered a single family account.  Someone other than Hoeger called Provence back to say that the school would send the report card, and it did so.  Aff. of Michael Provence,[2] Pl. Br. Ex. I; Pl. Dep. at 111-18.

The plaintiff has not worked since she stopped working at Avon.  She testified that she "would like to eventually seek employment."  When asked whether any of her doctors had told her she could not try to work again, she responded, "I am still on workers' compensation.  I mean, I don't – I don't know how else to –."  She testified that she did not know when she could return to work, and it would be up to her doctor.  Provence has not discussed returning to work with the surgeon who performed her September 2006 surgery.  Pl. Dep. at 108, 110, 129.

4.  <u>Provence's Limitations as a Result of Her Injury</u>

In describing the effects of her injury, the plaintiff testified that around the time of her departure from Avon, "I was in a lot of pain.  A lot of pain.  I was having a hard time with my arm, keeping it even to a desk, holding a phone, doing anything."  Provence testified that during the previous month, "I couldn't do anything.  I had to get a cleaning woman to clean my house.  It was difficult for me to cook, take care of my family.

_____

[2]     The affiant is the plaintiff's husband Michael, not her son Michael.

-9-

I really couldn't function too well at that time with my arm.  I was in pain."  Later, she became unable to afford a cleaning woman, and therefore, Provence testified, "I have my children helping.  My husband scrubbing tubs and floors, which he's not too fond of, because, you know, it's just still a little difficult for me."  The plaintiff testified that she goes to the grocery store and carries things with her left arm, and then her children help her unload when she gets home.  She also pays the family's bills and balances the checkbook.  Pl. Dep. at 68, 89-90, 109.

The plaintiff saw several doctors in connection with her injury.  One doctor, who examined her at her counsel's behest and who took down a medical history as the plaintiff provided it to him, stated in his report that she has numbness in her arm. Letter of Dr. Timothy J. Michals [hereinafter Michals Letter], Def. Br. Ex. 15 at 6.  The plaintiff also points to a prescription written by her primary care physician, Dr. Ronald A. Codario, who wrote on January 18, 2006, "Tina Provence is not capable of returning to work at this time.  She needs to be evaluated by pain management."  Pl. Br. Ex. C.  Codario referred Provence to a specialist.  Provence provided these documents to workers' compensation, which told her it would forward the information to Avon.  Pl. Dep. at 92-94.

II.   <u>Analysis</u>

    A.   Discrimination and Failure to Accommodate Under the ADA[3]

        For the purpose of this motion, the defendant argues only that the plaintiff is not disabled within the ADA's definition of that term.  It does not argue that other elements of the plaintiff's ADA claim are undisputed.

        To state a claim for discrimination or failure to accommodate under the ADA, the plaintiff must establish that she is a "qualified individual with a disability."  A "disability" is defined as (1) "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual"; (2) "a record of such impairment"; or (3) "being regarded as having such an impairment."  42 U.S.C. § 12102(2)(A)-(C).

        The plaintiff argues that she meets both prong (1) and prong (3) of this definition and is therefore disabled under the ADA.  The defendants counter that the plaintiff has not shown that she has an impairment that "substantially limits" a "major

---

   [3]   Count 1 of the Second Amended Complaint is entitled "Violation of Americans with Disabilities Act," but also mentions the Pennsylvania Human Relations Act ("PHRA") in the body of the count.  Compl. ¶ 52-53.  To the extent the plaintiff brings a claim under the PHRA, the Court's analysis of her ADA claim applies to her PHRA claim.  <u>See, e.g.</u>, <u>Rinehimer v. Cemcolift, Inc.</u>, 292 F.3d 375, 382 (3d Cir. 2002) ("The PHRA is basically the same as the ADA in relevant respects and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts." (quotations omitted)).

life activity."  Further, they argue that there is no evidence that they regarded the plaintiff as having an impairment that "substantially limits" a "major life activity."  The parties agree that the plaintiff has a physical impairment as a result of her arm and shoulder injury.

In the Third Circuit, the court first determines whether the plaintiff is substantially limited in any major life activity other than working.  If the plaintiff is not so limited, then the court determines whether the plaintiff is substantially limited in the major life activity of working.  Mondzelewski v. Pathmark Stores, 162 F.3d 778, 783 (3d Cir. 1998) (citing 29 C.F.R. App. § 1630.2(j)).


1.   Definitions

As the United States Court of Appeals for the Third Circuit has noted, the EEOC defines a "major life activity" as "those basic activities that the average person in the general population can perform with little or no difficulty."  Marinelli v. City of Erie, 216 F.3d 354, 361 (3d Cir. 2000) (citing 29 C.F.R. App. § 1630.2(i)).  Such activities are those that are "of central importance to daily life."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002).

"Substantially limits" means the plaintiff is unable to perform a task or is "significantly restricted as to the

-12-

condition, manner, or duration" under which she can perform the task. Marinelli, 216 F.3d at 361 (citing 29 C.F.R. App. § 1630.2(j)(1)(i)-(ii)). As the Supreme Court has noted, "'substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" Toyota, 534 U.S. at 196. To effectuate congressional intent, "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." Id. at 197. "The impairment's impact must also be permanent or long term." Id. at 198. Nevertheless, the ADA requires only substantial limitations, "not utter inabilities." Bragdon v. Abbott, 524 U.S. 624, 641 (1998). "When evaluating substantial limitation, courts must consider a plaintiff's ability to compensate for his disability through mitigating measures, but the essence of the inquiry regards comparing the conditions, manner, or duration under which the average person in the general population can perform the major life activity at issue with those under which an impaired plaintiff must perform." Emory v. AstraZeneca Pharm. LP, 401 F.3d 174, 179-80 (3d Cir. 2005) (internal citations omitted). The Court must evaluate the plaintiff's claims on a case by case basis. Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999); Marinelli, 216 F.3d at 362. This inquiry is "extraordinarily fact-intensive." Emory, 401 F.3d at 182.

-13-

2.    The Major Life Activities of Caring for Oneself
      and Lifting

In her brief, the plaintiff argues without citation to
the record that as a result of her shoulder and arm injury, she
can "no longer lift her arm above her head, lift more than 10
pounds, or perform any other physical aspect of her job, or much
else in her life."  Further, her "arm and shoulder are now
constantly painful."  She also cites to the Michals letter and
prescription from Dr. Codario as described above.

When pressed at oral argument to identify the major
life activity or activities in which the plaintiff is
substantially limited, the plaintiff's counsel stated that the
plaintiff "has had difficulty caring for herself, taking care of
her family, working certainly, especially in the job she had."
Tr. Oral Arg. at 5; see also id. at 10.  The plaintiff's counsel
also stated that the plaintiff's arm was "useless," pointing to
Dr. Codario's prescription.  Id. at 7-9.

As the Court noted at oral argument, Dr. Codario's
prescription does not show that the plaintiff's arm is "useless,"
but only that she could not return to her specific job at that
time.  Dr. Codario goes into no detail regarding what tasks
Provence was able or unable to perform, and whether those
impairments were likely to be long term or permanent.

The plaintiff's reliance on Dr. Michals's letter is
misplaced.  As the letter states, Dr. Michals is a forensic

-14-

psychiatrist who examined the plaintiff at plaintiff counsel's behest.  Dr. Michals's statements about the plaintiff's physical conditions are simply summaries of the medical history that the plaintiff herself provided to him.  Michals Letter at 2.  The Court is therefore left with only the plaintiff's own testimony to substantiate the plaintiff's argument that she is disabled under the ADA.

A plaintiff's failure to present expert medical evidence of substantial limitation in a major life activity is not dispositive, but the Court can weigh that failure in determining whether the plaintiff has carried her burden.  The more amenable the plaintiff's injury is to a lay jury's comprehension, the less important expert medical evidence is. Arm pain is among the least technical of medical difficulties and therefore is amenable to comprehension by a lay jury.  Marinelli, 216 F.3d at 360-61.  A mere medical diagnosis is insufficient to show substantial limitation; rather, the plaintiff must adduce specific evidence of her condition's effect on her personally. Toyota, 534 U.S. at 198.

The Marinelli court held that cleaning is only a "major life activity" "to the extent such an activity is necessary for one to live in a healthy or sanitary environment."  Marinelli, 216 F.3d at 362-63.  In other words, cleaning must be part of "caring for oneself" in order to be considered a "major life

activity."  The major life activity of caring for oneself
includes only the most basic chores, like washing dishes and
picking up trash.  It does not include scrubbing the floors.  It
does not include housework other than "basic chores."  Id.  The
plaintiff's claim that Marinelli supports a blanket inclusion of
a generalized category of "cleaning" as a major life activity is
inaccurate.

        The Marinelli plaintiff, like Provence, suffered from
an arm injury.  The United States Court of Appeals for the Third
Circuit found the following testimony by Mr. Marinelli to be
insufficient to show substantial limitation in the major life
activity of caring for oneself:

> Everything changed.  I used to scrub the
> floors in the house, wash the walls, do the
> dishes, clean the counters, do the housework.
> . . . After the injury, I couldn't do most
> of that. . . .  Like if I tried to wash a
> floor, I'm right-handed.  I can't use my left
> hand.  And even when you're using your right
> hand, if I put weight on the left hand, I'm
> collapsing.  It was ridiculous.

Id. at 363 (emphasis added by the Marinelli court).  The court
noted that among the activities on that list, only doing the
dishes is one that courts have held to be included in the major
life activity of caring for oneself.  It further stated that the
plaintiff had not described how his medical condition affected
his ability to do dishes or whether he was partially or wholly
prevented from doing dishes.  Under such circumstances, the

-16-

plaintiff's "cursory statement" was insufficient to withstand a motion for judgment as a matter of law.  Id.; see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (stating that the standard on a motion for summary judgment is the same as the standard on a motion for judgment as a matter of law).

Provence's testimony is remarkably similar to that of the Marinelli plaintiff.  She testified that she felt she could not return to work the week of January 17, 2006, because she was "having a hard time with [her] arm, keeping it even to a desk, holding a phone, doing anything."  During the previous month, the plaintiff "couldn't do anything. [She] had to get a cleaning woman to clean [her] house.  It was difficult for [her] to cook, take care of [her] family. [She] really couldn't function too well at that time with [her] arm."  After she became unable to afford a cleaning woman, Provence had "[her] children helping. [Her] husband scrubbing tubs and floors . . . because . . . it's just still a little difficult for [her]."  Pl. Dep. at 68, 89-90, 109.  The plaintiff's statements that she was "having a hard time," that "[she] couldn't do anything," and that tasks were "difficult," are similar to the statements of the Marinelli plaintiff, which the Court of Appeals rejected.  As noted above, Marinelli expressly excludes scrubbing floors from the definition of caring for oneself.  The plaintiff's testimony that she had to

-17-

hire a cleaning woman certainly raises the inference that she was having trouble doing housework.  This testimony is insufficient, however, to raise the inference that she was substantially limited in the narrow category of tasks, such as washing dishes or basic personal care, that courts have found qualify as "caring for oneself."

Where the Court of Appeals and other district courts in this circuit have found arm and shoulder injuries to substantially limit the major life activity of caring for oneself, the evidence of the plaintiff's impairment has been much stronger and more specific.  For instance, in Emory, "[t]he record [was] replete with references to the severe restrictions imposed by Emory's impairments," at least some of which had been "detailed by physicians and therapists."  As the court noted, the plaintiff had, since childhood, been "unable to perform, or only able to perform with significant difficulty, a range of manual tasks central to daily life."  The plaintiff had weakness and partial paralysis of his right arm; lacked grip, strength, and dexterity; was "unable to perform a number of more personal manual tasks involving dressing, eating and maintaining personal hygiene"; could not "tie his shoes or necktie, open a jar, cut his nails, perform various household chores and repairs, remove heavy dishes from the oven, change a diaper, carry his children up the stairs, or cut his own meat with a knife and fork."  These

-18-

activities, stated the court, were "but a few examples" of the plaintiff's impairments in performing activities "of central importance to people's daily lives." Emory, 401 F.3d at 181.

In another case, the plaintiff proffered the statements or reports of three doctors, one of whom stated that the plaintiff was "substantially limited in performing the major life activities of caring for herself, lifting more than five pounds with her right hand, carrying in excess of five pounds, gripping, grasping, holding, pinching with her right hand, and frequently lifting her right arm over head for an indefinite period of time." Point-du-Jour v. County of Bucks, No. 99-583, 2000 WL 288247, at *3 (E.D. Pa. Mar. 7, 2000).  Provence's evidence falls far short of the level of evidence in these cases.

As for the plaintiff's other impairments, the EEOC regulations mention "lifting" as a major life activity. Marinelli states in dicta, however, that a ten-pound lifting restriction is not a substantial limitation on a plaintiff's ability to lift.  Marinelli, 216 F.3d at 363-64.  Further, pain alone is not enough to show that the plaintiff is substantially limited in a major life activity.  See, e.g., id. at 357, 360-61; Emerick v. Norfolk S. Ry. Co., No. 03-266, 2006 WL 3692595, at *7 (W.D. Pa. Dec. 12, 2006).

The Court therefore finds that the plaintiff has failed to carry her burden of showing that she is substantially limited in the major life activities of caring for oneself and lifting.

### 3.   The Major Life Activity of Working

To establish disability based on being substantially limited in the major life activity of "working," the plaintiff

> must, at minimum, allege that he or she is unable to work in a broad class of jobs.  The [Supreme] Court explained that to be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job choice.

Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 512 (3d Cir. 2001) (citing Sutton, 527 U.S. at 491) (internal quotations omitted).  The plaintiff does not address this argument separately from her general and conclusory claims that she is disabled and impaired.  Pl. Opp. at 15-17.

In this area, as in the discussion of other alleged impairments, the plaintiff cannot rest on the statement by her doctor that, at a particular point in time, she was unable to return to work.  The doctor did not address whether she was unable to perform other jobs.  When asked at her deposition whether she had been told by a doctor she could not work, the plaintiff was unsure.  There is insufficient evidence in the

record regarding whether the plaintiff is substantially limited in her ability to perform a "broad class" of jobs.

       4.   Regarded as Being Substantially Limited in a Major Life Activity

       For an individual to be "disabled" under the "regarded as" portion of the ADA's definition of disability, the individual must demonstrate either that: (1) despite the plaintiff's having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a nonlimiting impairment that the employer mistakenly believes substantially limits major life activities. "In either case, the definition of 'substantially limits' remains the same as it does in other parts of the statute . . . ." Tice, 247 F.3d at 514. Moreover, in either case, "it is necessary that a [defendant] entertain misperceptions about the [plaintiff]." Sutton, 527 U.S. at 489.

       For instance, the United States Court of Appeals for the Third Circuit has ruled that a "regarded as" claim is made out when there is evidence in the record of the employer's confusion and fundamental misunderstanding about the extent of the employee's limitations, coupled with a failure to consult with her doctors, evaluate her, or view her medical records. Deane v. Pocono Med. Ctr., 142 F.3d 138, 144-45 (3d Cir. 1998).

Provence does not proffer evidence that the school regarded her as being any more limited than she actually is or that it entertained misperceptions about her physical abilities. Rather, she argues that the mere fact that the school knew of her physical limitations and offered her accommodations proves that it "regarded" her as disabled under the ADA.  Pl. Opp. at 17. This argument is meritless.  Mere knowledge of an impairment and attempts to accommodate on the defendant's part do not establish that the defendant regarded the plaintiff as substantially limited in a major life activity.  <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 109 (3d Cir. 1996).  The policy implications of a contrary rule would be undesirable, as such a rule would deter employers from seeking to accommodate their employees' needs.

B.   <u>Retaliation Under the ADA</u>

Retaliation claims under the ADA are analyzed under the same framework as Title VII retaliation claims.  <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 188 (3d Cir. 2003).  To establish a prima facie claim of retaliation, the plaintiff must show that: (1) she engaged in protected activity; (2) her employer took a materially adverse action against her; and (3) there was a causal connection between her participation in the protected activity and the employer's action.  <u>LeBoon v.</u>

<u>Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 231-32 (3d Cir. 2007).

The parties do not dispute that Provence satisfied prong (1) of this test by filing a complaint with the EEOC on July 6, 2006, and by filing this lawsuit, which the docket reflects was served on the defendants on March 7, 2007.  The plaintiff has argued in her brief and at oral argument that the filing of the federal lawsuit, not the EEOC complaint, is the date the Court should consider in evaluating her retaliation claim.  Pl. Br. at 23, 25; Tr. Oral Arg. at 37-43.

Under prong (2), an employer's actions were "materially adverse" if those actions "could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 57 (2006) (quotations omitted).  The Supreme Court has stated that "<u>material</u> adversity" is required and that "trivial harms . . . petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  The standard is an objective, not a subjective one.  <u>Id.</u> at 68.  Further, "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  <u>Id.</u> at 67.

Under prong (3) of the test, the plaintiff must demonstrate a causal connection between the plaintiff's protected

-23-

activity and the defendant's materially adverse action.  Temporal proximity alone may be sufficient to show causation where it is unusually suggestive.  If the timing of the adverse action is not unusually suggestive, a court must evaluate whether the record as a whole is sufficient to raise an inference of retaliation.  The court should consider any evidence of intervening antagonism, inconsistencies in the employer's proffered reasons, and other evidence raising an inference of retaliatory animus.  LeBoon, 503 F.3d at 232-33 (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81, 284 (3d Cir. 2000)) (internal citations omitted).

  Here, the plaintiff alleges that Avon took the following materially adverse actions: on April 12, 2007, Provence's daughter Jacqueline received detention, while other students who engaged in similar behavior did not; in or about April 2007, the school subjected Jacqueline to closer scrutiny than her peers; and in or about June 2007, Avon withheld Provence's son Michael's report card on the erroneous pretext that his lunch account was not fully paid.

  None of these actions rises to the level of "materially adverse."  Rather, they are at best "petty slights" or "minor annoyances."  It is doubtful that any of them created any injury or harm.  The plaintiff argues that because several other Avon employees have children at the school, they would be deterred by

the prospect of the school's taking action against their children. These actions are simply not serious enough, however, to deter a reasonable employee from filing a discrimination lawsuit in good faith. As to the first incident, the plaintiff admitted that her daughter committed an infraction and was not unjustly punished; the plaintiff merely objected to other students' not being punished. In any event, absent further evidence of the consequences of the school's action, a single detention is not "materially adverse."

The details of the second alleged retaliation are too vague and non-specific for the Court to consider this as retaliation. The third incident, in which Avon withheld Provence's son's report card, was rectified when brought to the school's attention.

Finally, the plaintiff simply proffers no evidence of causation other than the fact that the incidents occurred after she filed her lawsuit. The plaintiff's brief states, without citing to the record, that prior to Provence's filing this suit, her children were treated fairly and equally and were not singled out. Pl. Br. at 25. As the plaintiff points out, Sokolowski had already left Avon by the time of the allegedly retaliatory incidents, and it is unclear on this record who at Avon may have taken, or known about, the actions against Provence's children. Further, the plaintiff also testified to an incident in which

other students wrote threatening messages about Jacqueline on the bathroom wall, but the school did not take any action, nor did it call the Provences.  That incident occurred during the spring of 2006, before the plaintiff had filed even her EEOC complaint. Pl. Dep. at 113-14.  Thus, the plaintiff has failed to carry her burden of presenting a prima facie retaliation claim.

     C.    Negligent and Intentional Infliction of Emotional Distress

       The plaintiff brings these claims under Pennsylvania law against Sokolowski only.[4]  The Pennsylvania Workers' Compensation Act ("PWCA") bars all negligence actions against a fellow employee for employment-related injuries, but not suits against fellow employees for intentional torts.  As the statute provides:

> If disability or death is compensable under this act, a person shall not be liable to anyone at common law or otherwise on account of such disability or death for any act or omission occurring while such person was in the same employ as the person disabled or killed, except for intentional wrong.

77 Pa. Cons. Stat. § 72 (emphasis added); see also Churchray v. Park Place Enters., Inc., No. 06-531, 2006 WL 1865001, at *3 (E.D. Pa. June 30, 2006); Ambruster v. Epstein, No. 96-1059, 1996

---

    [4]    The plaintiff's original complaint included these charges against Avon, as well, but the Court dismissed the emotional distress claims as to Avon.  Order of June 21, 2007.

WL 289991, at *7-*8 (E.D. Pa. May 31, 1996); <u>Barber v. Pittsburgh</u>
<u>Corning Co.</u>, 555 A.2d 766, 770 (Pa. 1989); <u>Vosburg v. Connelly</u>,
591 A.2d 1128, 1132-33 (Pa. Super. Ct. 1991).

Provence's claim against Sokolowski for negligent
infliction of emotional distress ("NIED") is therefore preempted
by the PWCA.[5]  Her claim for intentional infliction of emotional
distress ("IIED"), however, is not preempted.

The Pennsylvania Supreme Court has not officially
recognized the tort of IIED, but the United States Court of
Appeals for the Third Circuit has predicted that the Pennsylvania
Supreme Court would adopt the tort.  <u>Williams v. Guzzardi</u>, 875
F.2d 46, 51 (3d Cir. 1989).  Pennsylvania courts and federal
courts interpreting Pennsylvania law have consistently assumed
without deciding that Pennsylvania does recognize the tort.  <u>See,</u>
<u>e.g.</u>, <u>Televandos v. Vacation Charters, Ltd.</u>, 264 Fed. Appx. 190,
192 & n.1 (3d Cir. 2008) (citing <u>Taylor v. Albert Einstein Med.</u>
<u>Ctr.</u>, 754 A.2d 650, 652 (Pa. 2000)).

Provence has not proffered evidence that would support
a claim for IIED.  To prove such a claim, the plaintiff must show

_____

[5]      The Court notes that, in any case, the plaintiff has
not met the requirements for NIED.  One element of that tort is
that the plaintiff suffer physical harm from the defendant's
conduct.  <u>Matczak v. Frankford Candy & Chocolate Co.</u>, 136 F.3d
933, 940 (3d Cir. 1997).  Crying does not count as physical harm
for this purpose.  <u>Id.</u>  As the plaintiff's counsel conceded at
oral argument, the plaintiff has adduced no evidence of physical
injury as a result of Sokolowski's alleged actions.  Tr. Oral
Arg. at 54.

that the defendant's behavior "was of an extreme or outrageous
type. . . . [I]t is extremely rare to find conduct in the
employment context that will rise to the level of outrageousness
necessary to provide a basis for recovery for the tort of
intentional infliction of emotional distress." Matczak v.
Frankford Candy & Chocolate Co., 136 F.3d 933, 940 (3d Cir.
1997). Provence has proffered evidence only that Sokolowski
intimidated and yelled at her and treated her unfairly. She
states that Sokolowski had a plan to get rid of her and contrived
excuses to carry out that plan, including interviewing her
replacement before she left Avon. Pl. Br. at 20-21. This simply
does not rise to the level of "extreme or outrageous" behavior
necessary to sustain a claim for IIED.

Further, the Pennsylvania Supreme Court has held that
the plaintiff's distress must be proven by "competent medical
evidence." Kazatsky v. King David Mem'l Park, Inc., 527 A.2d
988, 995 (Pa. 1987); see also Williams, 875 F.2d at 51 (quoting
Kazatsky's requirement that the plaintiff present "some objective
proof of severe emotional distress"). At least two Superior
Court cases have interpreted Kazatsky's directive to require
actual physical harm to the plaintiff. Reeves v. Middletown
Athletic Ass'n, 866 A.2d 1115, 1122-23 (Pa. Super. Ct. 2004)
(citing Fewell v. Besner, 664 A.2d 577, 582 (Pa. Super. Ct.
1995)). Regardless of whether actual physical harm or simply

-28-

expert medical opinion is required, Provence has failed to carry her burden.  The plaintiff conceded that she has sustained no physical harm because of Sokolowski's conduct.  Tr. Oral Arg. at 54.  As for expert medical opinion, Dr. Michals's report states that "[a]t times, [Provence] manifests some depressive symptoms and she becomes teary even providing some of the history. . . . She manifests no anxiety features."  Michals Letter at 8.  This evidence is insufficient to meet the plaintiff's burden.  It lacks a comparison to Provence's mental health before the events of this suit and does not separate out the effects of Provence's arm injury, losing her job, and Sokolowski's specific behavior toward her.

    D.    <u>FMLA</u>

         Under the FMLA, an eligible employee is entitled to take 12 weeks of leave during any 12-month period for, among other reasons, "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The statute provides, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  <u>Id.</u> § 2615(a)(1).

         The plaintiff argues both that she was forced to take FMLA leave against her will and that she was never given notice

that she was being placed on FMLA leave.  The statute does not provide a cause of action for employees who are qualified for leave but do not want to be placed on leave.  As the United States Court of Appeals for the Second Circuit has noted, "forced leave, by itself, does not violate the FMLA."  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 175 (2d Cir. 2006) (cited with approval in a non-precedential opinion by Foster v. N.J. Dep't of Transp., 255 Fed. Appx. 670, 671 n.1 (3d Cir. 2007)).  The employer has the responsibility of designating the leave and of notifying the employee of its decision.  29 C.F.R. § 825.208.[6] The plaintiff claims that the statute gives her an "absolute right" to respond to her employer's decision to place her on FMLA leave.  Pl. Br. at 27.  This is not the case.  Although the regulations provide that the employer should provide the employee of notice and that the employer and employee should discuss the decision if there is disagreement, the regulations do not state that the employee has a right to challenge the employer's placing her on FMLA leave.

The plaintiff does not argue that she was ineligible for FMLA leave during the fall of 2005.  Additionally, the parties do not seem to contest that Provence was eligible for

---

[6]     The Court notes that the validity of this regulation has been called into question by the Supreme Court's rejection of a similar notice provision.  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 88 (2002).

leave under the workers' compensation system.  Under the applicable regulations, however, FMLA leave and workers' compensation leave may run concurrently, provided the employer provides proper notice and designation.  29 C.F.R. § 825.702(d)(2).

This observation leads to plaintiff's second argument – that Avon failed to give her proper notice, in violation of this and other regulations.  Failure to provide an employee with notice of her rights under FMLA can constitute an actionable interference with FMLA rights if the employee can show the failure to notify resulted in prejudice.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 144 (3d Cir. 2004).  If the employee was terminated after her 12 weeks of protected FMLA leave had elapsed, however, then the lack of notice did not prejudice her exercise of her FMLA rights.  Id. at 148.  This is true for the simple reason that if the employee had been fully aware of her FMLA rights, she still would have had no right under the statute to prevent her termination.  Further, the FMLA does not require an employer to provide a reasonable accommodation to an employee to facilitate her return to the same or equivalent position at the conclusion of her medical leave.  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002) (citations omitted).  It follows that the employee cannot show prejudice if she would not have been physically able to return to her job

within 12 weeks of taking leave.  <u>See, e.g.</u>, <u>Ashton v. Am. Tel. & Tel. Co.</u>, 225 Fed. Appx. 61, 67-68 (3d Cir. 2007) (non-precedential).

       The plaintiff's own evidence shows that she was not able to return to her job in January 2006 and that she was on leave for more than 12 weeks.  She therefore can show no prejudice to her rights under the FMLA as a result of the defendants' alleged failure to notify her of her FMLA rights or of her being placed on FMLA leave starting in September 2005.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TINA PROVENCE                  :          CIVIL ACTION
                               :
        v.                     :
                               :
AVON GROVE CHARTER SCHOOL,     :
et al.                         :          NO. 07-659

ORDER

AND NOW, this 28th day of July, 2008, upon consideration of the defendants' Motion for Summary Judgment (Docket No. 40), the plaintiff's opposition thereto, and the defendants' reply thereto, and following oral argument held on April 29, 2008, IT IS HEREBY ORDERED that the motion is GRANTED for the reasons stated in the accompanying memorandum.

Judgment is hereby entered for the defendants and against the plaintiff.  This case is CLOSED.

BY THE COURT:

/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.